**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| AMERICAN BERBER, INC., and | ) | Substantively Consolidated |
| | ) | |
| AMERICAN CARPET GROUP, INC., | ) | Case No. 19-41154-bem |
| | ) | |
| Debtors. | ) | |

**UNITED STATES TRUSTEE'S MOTION FOR APPOINTMENT**
**OF A CHAPTER 11 TRUSTEE OR EXAMINER**

COMES NOW Nancy Gargula, United States Trustee for Region 21 ("United States Trustee"), pursuant to 28 U.S.C. § 586(a)(3), and respectfully moves the Court to enter an order directing the appointment of a chapter 11 trustee, or, in the alternative, an examiner for American Berber, Inc., and American Carpet Group, Inc. In support of this motion, the United States Trustee shows the Court as follows.

**STANDING**

The United States Trustee is a party in interest and may raise, appear and be heard on any issue in any case of proceeding under title 11. 11 U.S.C. § 307. Pursuant to 28 U.S.C. § 586(a)(3), the United States Trustee's duties include supervising the administration of chapter 11 cases. The United States Trustee has standing to file motions to dismiss or convert chapter 11 cases, and to seek the appointment of a Chapter 11 trustee, or examiner under 11 U.S.C. §§ 307, 1104(a), 1104(c) and 1112(b)(1), as well as 28 U.S.C. § 586.[1]

---

[1] *See also* Collier on Bankruptcy ¶ 1112.04[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

## COURSE OF PROCEEDING

1. On May 16, 2019, American Berber, Inc., ("Berber") filed a voluntary petition for relief under chapter 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of Georgia.

2. In August 2019, the Court entered orders substantively consolidating Berber's estate with that of American Carpet Group, Inc. ("Carpet").[2]

3. On its petition, Berber estimated assets of approximately $1,694,357.37 and estimated liabilities between $500 million to $550 million.[3] Berber's List of 20 Largest Unsecured Creditors[4] indicates total debt in the amount of $5,196,171.02.[5]

4. According to the Disclosure Statement[6] filed on October 12, 2020, Berber was formed by Howard E. Johnson in 1997 as a carpet manufacturing company. Since its inception, Berber has been located in Dalton, Georgia.

5. According to the petition, schedules, and documents filed with the court, Howard E. Johnson is the Chief Executive Officer and the 100% owner and equity security holder of Berber.[7]

6. Berber continues to operate its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7. On June 26, 2019, the United States Trustee held and concluded the first meeting of creditors, at which Howard E. Johnson testified on behalf of Berber.

---

[2] Dkt. Nos. 63 and 66.
[3] Dkt. Nos. 1 and 54.
[4] Dkt No. 1.
[5] On July 24, 2019, the debtor in possession filed amended Schedules E/F and Summary of Assets and Liabilities reflecting an increase in total debts in the amount of $5,288,503.94. *See Dkt. No. 54.*
[6] Dkt. No. 112.
[7] Dkt. Nos. 1, 24 and 54.

## APPLICABLE STATUTES

### A. Appointment of a Chapter 11 Trustee

8.  Section 1104 sets forth the statutory provisions regarding the appointment of a trustee or examiner. The movant seeking the appointment of a chapter 11 trustee bears the burden of proof by a preponderance of the evidence.[8]

9.  Section 1104(a)(1) requires the court, upon request by the United States Trustee or a party in interest, to order the appointment of a trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause . . . ."

10. Through section 1104(a)(1), Congress has mandated that the chapter 11 debtor in possession, which acts as a fiduciary of the creditors of the bankrupt estate, be an honest broker.[9] The plain language of section 1104(a)(1) (specifically, the use of the word "shall") indicates that courts may not look beyond a finding of "cause" in considering appointment of a trustee. [10]

11. In the alternative, the court can order the appointment of a trustee pursuant to the

---

[8] *See Keeley &. Grabanski Land P'ship v. Keeley (In re Keeley and Grabankski Land P'ship)*, 455 B.R. 153, 162-163 (8th Cir. BAP 2011) (adopting preponderance of the evidence standard). *See also Tradex Corp. v. Morse*, 339 B.R. 823, 830-32 (D. Mass. 2006) (same); *In re Altman*, 230 B.R. 6, 16-17 (Bankr. D. Conn. 1999), *vacated in part on other grounds*, 254 B.R. 509 (D. Conn. 2000) (adopting preponderance standard); *In re Berwick Black Cattle Co.*, 405 B.R. 907, 912 (C.D. Ill. 2009); *In re Plaza del Retiro, Inc.*, 417 B.R. 632, 640 (Bankr. D.N.M. 2009) (noting split of authority on burden of proof issue); *see also Grogan v. Garner*, 498 U.S. 279, 286 (1991) (noting that the general standard of proof in civil and bankruptcy cases, and in nondischargeability litigation in particular, is a preponderance of the evidence). *But see In re Marvel Entertainment Group, Inc.*, 140 F.3d at 471 (3d Cir. 1998) (requiring clear and convincing evidence for the appointment of a trustee under 11 U.S.C. § 1104(a)).

[9] *See Wolf v. Weinstein*, 372 U.S. 633, 651 (1963) (acknowledging the willingness of courts to leave debtors in possession "is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee"); *In re V. Savino Oil and Heating Co.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) (stating that "the willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee. And if the debtor-in possession defaults in this respect, Section 1104(a)(1) [of the Code] commands that stewardship of the reorganization effort must be turned over to an independent trustee.") (cited with approval in *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 474 (3d Cir. 1998)).

[10] *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989) (stating that "[11 U.S.C. § 1104](a)(1) requires the bankruptcy court, upon motion, to appoint a trustee when the movant has proved 'cause,' which the statute defines to include incompetence and gross mismanagement."); *In re National Staffing Servs., LLC*, 2005 WL 3729404 at *2 (Bankr. N.D. Ohio Nov. 21, 2005) (11 U.S.C. § 1104(a)(1) provides for "the mandatory appointment of a trustee upon a specific finding of 'cause.'").

provisions of section 1104(a)(2). This subsection provides that the court shall order the appointment of a trustee if such an appointment is determined to be in the interests of creditors, any equity security holders, and other interests of the estate.

12. When a trustee is appointed "in the interests of creditors," it is not necessary to find that the debtor or management engaged in any misdeeds.[11] Under section 1104(a)(2) the court should consider the debtor's trustworthiness; past and present performance; likelihood of successful reorganization; absence of creditor confidence in current management; and the benefits of appointing trustee balanced against the cost of appointment.[12]

13. Finally, the court may order the appointment of a trustee if grounds exist for conversion or dismissal of the case but the court determines that the appointment of a trustee is in the best interests of the creditors and the estate. 11 U.S.C. § 1104(a)(3).

### B. Appointment of a Chapter 11 Examiner as Alternate Relief

14. If the court does not order the appointment of a trustee, section 1104(c) permits the court, on request of a party in interest or the United States Trustee, to order the appointment of an examiner. Such an appointment shall be ordered: (1) if it is determined to be in the interests of creditors, any equity security holders, and other interests of the estate or (2) if the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

15. Pursuant to section 1104(e), the U.S. Trustee shall move to appoint a trustee if

---

[11] *In re Sharon Steel*, 871 F.2d 1217, 1226 (3d Cir. 1989).
[12] *In re Eurospark Indus.*, 424 B.R. 621, 621 (Bankr. E.D.N.Y. 2010).

there are reasonable grounds to believe current company officials participated in actual fraud, dishonesty, or criminal conduct in the "management of the debtor or the debtor's public financial reporting."

16.     Section 1106 of the Bankruptcy Code provides that an examiner shall "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan."[13]  Bankruptcy courts have utilized examiners in complex cases to investigate all aspects of a debtor's bankruptcy proceeding, including investigating acts, conduct, assets, liabilities and financial condition of the debtor.[14]  An independent, disinterested examiner can perform an investigation without any bias or undue pressure from any constituency that has a conflict of interest with the debtor.[15]

## **CAUSE EXISTS FOR APPOINTMENT OF A TRUSTEE OF EXAMINER**

17.     Bankruptcy Code section 704(a)(8) requires Berber file with the Court and the United States Trustee periodic reports and summaries of the operation of its business, including a statement of receipts and disbursements, and such other information as the United States Trustee or the Court requires. Federal Rule of Bankruptcy Procedure 2015(a) directs chapter 11 debtors-in- possession to file the reports and summaries required by section 704(a)(8). After confirmation

---

[13] 11 U.S.C. §1106.

[14] *See In the matter of First American Health Care of Georgia, Inc.,* 208 B.R. 992, 994 (Bankr. S.D. Ga. 1996) ("Section 1104 clearly contemplates that if an investigation of any fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor by current or former management is necessary either to protect the interests of creditors, equity security holders, and the estate, or if the debtor's unsecured debt exceeds $5 million, the Court shall order the appointment of an examiner on motion and after notice and a hearing"); *In re Public Serv. Co. of New Hampshire*, 99 B.R. 177 (Bankr. D. N.H. 1989) (holding that the examiner shall "investigate acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan") and *In re A.H. Robins Co.,* 88 B.R. 742 (Bankr. E.D. Va. 1986) (appointing an examiner with authority to monitor the progress of the formulation of a plan of reorganization and to evaluate and suggest proposed elements of plan of reorganization).

[15] *See In the matter of First American Health Care of Georgia, Inc.,* 208 B.R. at 995 ("[t]he involvement of an examiner will contribute valuable perspective to a case with many competing interests at stake").

of the plan, the reorganized debtor is required to "file such reports as are necessary or as the court orders." 11 U.S.C. § 1106(a)(7). "Monthly reports and the financial disclosures contained within them are the life-blood of the Chapter 11 process and are more than mere busy work." *In re Andover Covered Bridge, LLC*, 553 B.R. 162, 173 (1st Cir. BAP 2016).

18. Conflicting and irregular information provided by Berber, including in monthly reports, suggests the possibility of "fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtors of or by current or former management of the debtor." 11 U.S.C. §1104(c). [16]

A. IRREGULARITIES REGARDING SALES, RECEIVABLES, AND RECEIPTS

19. During Berber's section 341 meeting of creditors on Wednesday, June 26, 2019, Howard Johnson testified that Berber intended to increase sales, collect approximately three-quarters of a million dollars on its accounts receivable, and successfully reorganize.[17]

---

[16] The United States Trustee does not suggest that the instances mentioned here are the only possible instances that call for the appointment of a trustee or examiner in this case.

[17] The following is an excerpt from the 341 Meeting of Creditors held on June 26, 2019 in Rome, Georgia for American Berber, Inc., Case No. 19-41154. Martin Ochs, trial attorney for the United States Trustee is designated as "MO," while Howard Johnson for American Berber, Inc. is designated as "HJ."
MO: What has to happen now for American Berber to be able to emerge from bankruptcy?
HJ: We'd have to fix our supply problem and increase our sales.
MO: And what steps are you taking to do that?
HJ: We are looking at the machines, going through our process, and trying to fix our quality issue and then our office staff – the folks that are there selling the carpet – are calling each one of our customers, talking to them about our problems and the lack of product that we had in the past, and our ability to supply their needs in the future.
MO: Do you think that American Berber has the ability to reorganize in a fair and successful manner?
HJ: We do. I do.
MO: AB has listed accounts receivable in the amount of about three-quarters of a million dollars. Are those collectible?
HJ: I don't… I believe they are… But, I don't know. You don't know if something is collectible until somebody pays you.
MO: No, but we usually have historical data to back us up.
HJ: Yes.
MO: Looking at that historical data, how much of that three-quarters of a million dollars is collectible?
…
MO: The 727 … three-quarters of a million dollars sounds more acceptable… You think that's collectible?
HJ: We do. Based upon our past.
MO: Since the filing of the Petition, has American Berber been able to collect on its accounts receivable?
HJ: To the best of my knowledge, we have.
MO: Do you know how much?
HJ: No, I don't.
MO: American Berber lists inventory of approximately a million dollars. Do you think that is a fair value for it? Do you think it can be liquidated at something close to that value?
HJ: I do.
MO: Okay. What is that? Finished goods?

20. Berber's monthly operating reports appear to show an abrupt halt in sales to more than 130 established credit customers in June 2019.[18] In each month between July 2019 through August 2020, Berber reported no new sales on account.[19] This suggests that Berber abruptly ceased making sales to all credit customers in or about June 2019.

21. The monthly reports also appear to show Berber ceased collection of accounts receivable. In May 2019, Berber reported collecting $146,736.30 on outstanding accounts receivable.[20] In June 2019, collections were $133,591.68.[21] In July 2019 collections totaled $109,928.62.[22] In August 2019, collections dropped to $2,794.92.[23] Reported collections remained below $20,000 per month from August 2019 through the following twelve months. Over those thirteen months combined, Berber reported collecting a net of $78,676.74 on total outstanding accounts receivable, for an average net collection of just $6,052.06 per month.[24] This thirteen-month net collections figure is roughly half of the amount of collections in May 2019.

22. In monthly reports, Berber reported that the vast majority of its credit clients did not make any payments on their accounts in June 2019, July 2019, August 2019, or September 2019.[25] Of the approximately 135 clients with non-zero accounts receivable balances in July 2019, 117 (86.67%) of these clients' accounts receivable totals remained the same at the end of August

---

HJ: Yes, sir.
MO: So that's carpet ready to go?
HJ: Yes, sir.
MO: Does that generally sell?
HJ: Well, it has in the past.

[18] *See* Dkt. No. 64, pp. 10-12.
[19] Attachment 1, Accounts Receivable Reconciliation. Second line: "PLUS: Current Month New Billings."
[20] *See* Dkt. No. 37, p. 11, "Collection During The Month."
[21] *See* Dkt. No. 64, p. 9, "Collection During The Month."
[22] *See* Dkt. No. 76, p. 6, "Collection During The Month."
[23] *See* Dkt. No. 77, p. 7, "Collection During The Month."
[24] *Compare* Dkt. No. 76, p. 6, "End of Month Balance" to Dkt. No. 110, p. 4, "End of Month Balance." Berber reported $363,854.40 of outstanding accounts in July 2019 and $285,177.66 thirteen months later in August 2020.
[25] *Compare* month end accounts receivable for each respective client across the four months of June 2019, July 2019, August 2019, and September 2019. Specifically, Dkt. No. 64, pp. 10-12; Dkt. No. 76, pp. 7-10; Dkt. No. 77, pp. 8-11; and, Dkt. No. 88, pp. 9-11.

2019.[26] Of the approximately 131 clients with non-zero accounts receivable balances in August 2019, 118 (90.08%) of these clients' accounts receivable totals remained the same at the end of September 2019.[27, 28] Berber did not write off any of its accounts that were over 90 days old at any time between October 2019 and August 2020.[29]

23. In its monthly operating reports, Berber continuously reported illogically negative accounts receivable balances that further suggest the possibility of "fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtors of or by current or former management of the debtor," (11 U.S.C. §1104(c)), a fundamental reason why an examiner shall "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan." 11 U.S.C. §1106.

24. Specifically, Berber reported a negative total accounts receivable balance in the 31-60 day old category in June 2019.[30] American Berber reported negative total accounts receivable balances in the 61-90 day category in June 2019[31], July 2019[32], and August 2019[33]. There was no explanation provided for these illogical negative balances.

25. Further, in June 2019, Berber reported illogical, mixed (positive and negative) accounts receivable balances for four clients. For one of these clients, Berber reported that the client had a positive accounts receivable balance in two age categories, a negative balance in two

---

[26] *Compare* Dkt. No. 76, pages 7-10 to Dkt. No. 77, pages 8-11.
[27] *Compare* Dkt. No. 77, pages 8-11 to Dkt. No. 88, pages 9-11.
[28] Two of the thirteen client balances that changed between August and September 2019 changed by less than $35. When these two trivial changes are recategorized as falling into the unchanged group, then the total clients with unchanged balances increased to 120 out of 131 clients (91.60%).
[29] Attachment 1, Accounts Receivable Reconciliation, "PLUS/MINUS: Adjustments or Writeoffs."
[30] *See* Dkt. No. 64, p. 9.
[31] *See* Dkt. No. 64, p. 9.
[32] *See* Dkt. No. 76, p. 6.
[33] *See* Dkt. No. 77, p. 7.

age categories, a zero balance in one category, and an overall total positive balance for the month.[34] For the other three of these clients, Berber reported that the client had a positive or zero accounts receivable balance in three age categories, a negative balance in one age category, and an overall total positive balance for the month.[35] Likewise, in July 2019, Berber reported illogical, mixed accounts receivable balances for four clients.[36] In August 2019, Berber reported mixed accounts receivable balances for five clients.[37] In September 2019, Berber reported mixed accounts receivable balances for five clients.[38]

26.    Despite no credit sales being reported for the fourteen month period of July 2019 through August 2020, Berber reported accounts receivable totals that increased for at least twenty credit customers between June and July 2019[39], for at least five credit customers between July and August[40], and for at least one credit customer between August and September.[41, 42] Based on the lack of new credit sales reported, it is odd to have reported increases in accounts receivable in July 2019, August 2019, and September 2019.[43]

27.    Additionally, despite reporting that no new sales on credit were made over the fourteen month period of July 2019 through August 2020, Berber reported in its monthly operating reports that there was a non-zero balance for total accounts receivable outstanding with an age of

---

[34] *See* Dkt. No. 64, p. 10. Account number 04115 for "Abraham Linc.; Bridgeport, WV." Reported values were as follows: Current = $152,437.69. 0-30 days = $5,844.18. 31-60 days = -$17,484.19. 61-90 days = -$27,512.83. 90+ days = $0. Total = $113,284.85.
[35] *See* Dkt. No. 64, pp. 11-12. Account number 06371 for "L & L Carpet; Hillsborough, NJ." Reported values were as follows: Current = $0. 0-30 days = $397.65. 31-60 days = $1,213.21. 61-90 days = $0. 90+ days = -$775.19. Total = $835.67. Account number 06845 for "Carpet Spectrum; Memphis, TN." Reported values were as follows: Current = $579.20. 0-30 days = $0. 31-60 days = $0. 61-90 days = $0. 90+ days = -$81.05. Total = $498.15. Account number 07729 for "Hom Furniture." Reported values were as follows: Current = $2,265.11. 0-30 days = $5,181.96. 31-60 days = $347.51. 61-90 days = -$463.77. 90+ days = 0. Total = $7,330.81.
[36] *See* Dkt. No. 76, pp. 7-10.
[37] *See* Dkt. No. 77, pp. 8-11.
[38] *See* Dkt. No. 88, pp. 9-11.
[39] *Compare* Dkt. No. 64, pp. 10-12 to Dkt. No. 76, pp. 7-10.
[40] *Compare* Dkt. No. 76, pp. 7-10 to Dkt. No. 77, pp. 8-11.
[41] Berber provided itemized accounts receivable records for only five months: May 2019, June 2019, July 2019, August 2019, and September 2019. Therefore, it was not possible to evaluate itemized accounts receivable for clients after the September 2019 Monthly Operating Report.
[42] *Compare* Dkt. No. 77, pp. 8-11 to Dkt. No. 88, pp. 9-11.
[43] Schedule of Receipts and Disbursements. Line 2: Receipts, Subline B. Accounts Receivable.

less than 30 days in six of those months.[44] Berber reported a non-zero balance for total accounts receivable outstanding with an age of 31-60 days in ten of those months. Berber reported a non-zero balance for total accounts receivable outstanding with an age of 61-90 days in twelve of those months.

28. Similarly, despite reporting that no new sales on credit made during the fourteen month period of July 2019 through August 2020, Berber continually reported outstanding accounts receivable that did not age over time. American Berber reported the same amount of outstanding accounts receivable in one age category across consecutive months despite the fact that the respective values should have aged over those times. Specifically, Berber reported consecutive, duplicate balances for two age categories in three two-month periods, and for one age category in one additional two-month period.[45]

29. In fact, in an examination of Berber's detailed accounts receivable reports for its clients provided in its monthly operating reports, each and every sampled client's accounts receivable values were irregularly reported. In particular, a sample of individual client accounts receivable records was tracked from June 2019 through September 2019.[46] Of the eighteen client accounts sampled and tracked over those four months, each and every account displayed irregular reporting characteristics that suggested records were manipulated. Specifically, the majority of

---

[44] Berber did not provide an aging schedule for October 2019. The pattern of reporting around that month suggests Berber would have reported a balance in all categories of ages, including 0-30 days, 31-60 days, and 61-90 days.

[45] Berber reported -$15,855.67 of 61-90 day old accounts receivable in June 2019 and again in July 2019. Berber reported $8,710.81 of 90+ day old accounts receivable in June 2019 and again in July 2019. Berber reported $17,667.50 of 61-90 day old accounts receivable in November 2019 and again in December 2019. Berber reported $5,117.85 of 90+ day old accounts receivable in November 2019 and again in December 2019. Berber reported $82,944.31 of 61-90 day old accounts receivable in April 2020 and $82,914.84 in May 2020. Berber reported $196,304.10 of 90+ day old accounts receivable in March 2020, while reporting $196,063.03 in that same category in April 2020 and again in May 2020.

[46] The initial, random sample of client accounts was drawn based on 10% of apparently outstanding credit accounts in September 2019. It appeared from Berber's detailed accounts receivable reports, at first, that there were roughly 178 credit accounts outstanding as of September 2019. The 10% sample therefore was created of 18 client accounts (10% of 178 clients). It later became apparent that there were far less credit accounts outstanding than apparently listed in the detailed accounts receivable reports provided by Berber as attachments to its Monthly Operating Reports. Therefore, the sample of clients examined here is closer to 13% of the total outstanding credit clients as of September 2019.

these clients had the exact same value and age of accounts receivable reported across consecutive months, as if the accounts receivable balances never aged over time.

30. Further, at least one of these sampled clients was not listed as a client in June 2019, but then was listed as a client in July 2019 with accounts receivable outstanding aged 31-60 days.[47] Similarly, three others of these eighteen sampled clients were not listed as clients in June 2019, but then were listed as clients in July 2019 with current or 1-30 day old balances.[48] There were no corresponding increases in income from newly recorded credit sales on the respective Schedules of Receipts and Disbursements, nor were any new credit sales reported on the respective Attachments 1 related to the increased accounts receivable reported for any of these four clients.

31. Consistent with these observations of irregular accounts receivable reporting by American Berber, Plaintiff Joseph Farless's Brief in Support of Trustee's Motion to Dismiss, filed in this case by Jeffrey W. Maddux on October 14, 2020, suggests Berber failed to report in its monthly operating reports sales made to and payments received from Field Turf, a customer of American Berber.[49]

B. DISCREPANCIES REGARDING PERSONNEL

32. It also appears that American Berber misreported personnel facts and related payroll expenses.

33. First, Berber continually reported having four full-time employees, even while reporting that payroll expenses were $0. On Attachment 7 to its monthly operating reports, Berber reported having four full-time employees in each month of May 2019 through August 2020.[50]

---

[47] Account 05300, Floors R Us.
[48] 1) 05160, Galloway Flooring, 2) 04993 Ron's Flooring, and 3) 04235 Variety.
[49] Dkt. No. 115, pp. 5-9.
[50] Three reporting behaviors indicate that American Berber conscientiously completed Attachment 7, such that the continual reporting of having four full-time employees could not have been in error. First, the dates listed at the top of each Attachment 7 were updated for each respective month. Second, information reported in the "Confirmation of Insurance Portion" of Attachment 7 changed over time. Specifically, there was nothing reported in the insurance information section of Attachment 7 from May 2019

However, Berber reported no activity in the payroll bank account[51] or in the tax bank account[52] over time. These bank accounts specifically were for payroll expense and payroll tax accounting. Despite reporting no activity in these bank accounts related to payroll, Berber reported $61,005.84[53] of payroll expenses in May 2019, $8,832.25[54] in June 2019, and $8,832.35[55] in July 2019 before shifting from reporting payroll expenditures to reporting contract labor expenditures.[56]

34. Second, Berber continually reported having four full-time employees, even though it never established a required payroll bank account or a required (payroll) tax bank account. Berber provided no information on any respective Attachment 7 for the fields of "Name of Bank," "Branch," "Account Name," or "Account Number." No activity ever was reported in these accounts.[57]

C. OMISSION OF OTHER MATERIAL INFORMATION

35. It appears Berber deliberately omitted information from its monthly operating reports.

36. First, Berber provided no information about its largest influx of cash. Specifically, in November 2019, Berber reported $208,748.52 in Other Receipts[58], which is nearly ten times

---

to November 2019. This changed in December 2019 when American Berber completing the "Confirmation of Insurance Portion" of Attachment 7. American Berber provided information in that Portion until July 2020. In August 2020, that Portion returned to being blank. Third, American Berber began reporting expenses for contract labor at the same time that it ceased reporting expenses for payroll.

[51] Attachment 4C: Monthly Summary of Bank Activity – Payroll Account. Attachment 5C: Check Register – Payroll Account.
[52] Attachment 4D: Monthly Summary of Bank Activity – Tax Account. Attachment 5D: Check Register – Tax Account.
[53] *See* Dkt. No. 37, p. 2, Disbursements Line 5J: "Payroll – Net."
[54] *See* Dkt. No. 64, p. 2, Disbursements Line 5J: "Payroll – Net."
[55] *See* Dkt. No. 76, p. 2, Disbursements Line 5J: "Payroll – Net."
[56] Disbursements Line 5C: "Contract Labor."
[57] This reporting contrasts with the fact that American Berber completed those same fields for its Operating Accounts. The contrast in reporting between the types of accounts suggests that the reporting for the payroll and tax bank accounts was deliberate. Specifically, Attachment 4A: Monthly Summary of Bank Activity – Operating Account for DIP. Attachment 5A: Check Register – Operating Account for DIP. Attachment 4B: Monthly Summary of Bank Activity – Operating Account. Attachment 5B: Check Register – Operating Account.
[58] *See* Dkt. No. 90, p. 2, Receipts, Line 2C.

its average total receipts in any given month. Berber listed "See Attached"[59] for the details of this unusually large amount, but it failed to provide any respective attachment.

37.    Second, Berber failed to identify compensation paid to Howard Johnson. Howard Johnson testified at a 341 meeting of creditors on June 26, 2019 in Rome, Georgia that he drew a salary of $12,000 per month from Berber.[60] There is a line item for a payment of $8,832.35 to Howard Johnson in the bank reconciliation details provided by Berber for May 2019,[61] June 2019,[62] and July 2019.[63] However, Berber does not list any of these amounts paid to Howard Johnson as compensation of an owner or officer as required on Attachment 7 of the respective reports, nor does American Berber identify any of these payments in the text of its Monthly Operating Reports for those months. There were no line item reconciliation references to any payments made by Berber to Howard Johnson for any month after July 2019 through its most recent Monthly Operating Report for August 2020, except for two apparent reimbursements and

---

[59] *See* Dkt. No. 90, p. 3, Detail of Other Receipts and Other Disbursements.
[60] The following is an excerpt from the 341 Meeting of Creditors held on June 26, 2019 at 10:00AM in Rome, Georgia for Howard Johnson, Case No. 1941149; American Corporate Group, 19-41150; and American Berber, Case No. 19-41154. "MO" is the trial attorney with the United States Trustee interviewing Howard Johnson ("HJ").
MO:  Okay.  Do you take any income from either American Carpet or American Berber?
HJ:  Uh…*(pause)*…yes and no.  And that's difficult to answer.  I have just started taking a salary from the company.
MO:  Which company?
HJ:  From American Berber.
MO:  And then how much do you take as a salary?
HJ:  I take twelve thousand dollars per month.
[61] *See* Dkt. No. 37, p. 27, Reconciliation Detail for Georgia Bank & Trust Account, check #109533 dated May 23, 2019 for $8,832.35 to Howard Johnson. There is no corresponding entry for Officer or Owner Compensation on Attachment 7. (*See* Dkt. No. 37, p. 38.)
[62] *See* Dkt. No. 64, p. 18, Reconciliation Detail for American Berber – DIP Account, Check 1035 dated June 26, 2019 for $8,832.35. There is no corresponding entry for Officer or Owner Compensation on Attachment 7. (*See* Dkt. No. 64, p. 41.)
[63] *See* Dkt. No. 76, p. 16, Reconciliation Detail for American Berber – DIP Account, Check 1035 dated July 19, 2019 for $8,832.35. There is no corresponding entry for Officer or Owner Compensation on Attachment 7. (*See* Dkt. No. 76, p. 30.)

one again unidentified payment of $10,000 in November 2019.[64, 65, 66, 67] This implies that Howard Johnson received no compensation from Berber for August – October 2019 or for December 2019 – August 2020.

38. Third, in addition to the information already mentioned to have been omitted by Berber from its Monthly Operating Reports, Berber consistently did not report information for several required portions of its monthly operating reports. Specifically, Berber did not report cumulative amounts for petition to date line items on the Schedule of Receipts and Disbursements. It did not provide any explanation of receivables in the "Over 90 Days" category on Attachment 1. It did not provide information about its method of costing inventory, nor about inventory aging on Attachment 3. It did not provide any information about taxes owed and due on Attachment 6. It did not provide any information on significant developments during any reporting periods on Attachment 8.

39. Fourth, Berber failed to provide monthly operating reports by required deadlines. Of the fifteen Monthly Operating Reports submitted by Berber since the initiation of its case through October 25, 2020, only two reports were submitted to the court on time.[68]

---

[64] *See, e.g.,* August 2019 – Dkt. No. 77, pp. 18-20; September 2019 – Dkt. No. 88, pp. 18-20; and, October 2019 – Dkt. No. 89, pp. 12-14.

[65] From an examination of line items provided as reconciliation details to each month's Attachment 5A, Check Register Detail for Operating Account. Note that in July 2019, Howard Johnson received a reimbursement of $2,267.93. *See* Dkt. No. 76, p. 3. In October 2019, Howard Johnson received $230 for unspecified reasons. *See* Dkt. No. 89, p. 3. These payments are not considered compensation for purposes of this statement.

[66] In November 2019, there was a line item expenditure in its Operating Account reconciliation details for a payment of $10,000 to Howard Johnson. (*See* Dkt. No. 90, p. 9, Check 1294 on November 19, 2019). However, American Berber again provided no textual reference to this amount, nor did it report any compensation to officers or owners on its November 2019 Attachment 7. (*See* Dkt. No. 90, p. 22).

[67] American Berber did report $12,407.60 in "Other Operating Expenses" in November 2019 (*See* Dkt. No. 90, p. 2, Disbursements, Line 5W), but also failed to provide an explanation for this amount (*See* Dkt. No. 90, p. 3, Detail of Other Receipts and Other Disbursements).

[68] American Berber delinquently filed the following reports. Dkt. No. 37 – July 1, 2019; Report for: 05/16/2019 through 05/31/2019. Dkt. No. 56 – July 25, 2019; Report for: June 1, 2019 through June 30, 2019. Dkt. No. 64 – August 29, 2019; Report for: 06/01/2019 through 06/30/2019. Dkt. No. 65 – August 29, 2019; Report for: 07/01/2019 through 07/31/2019. Dkt. No. 77 – October 15, 2019; Report for: 08/01/2019 through 08/31/2019. Dkt. No. 88 – December 19, 2019; Report for: 09/01/2019 through 09/30/2019. Dkt. No. 89 – December 20, 2019; Report for: 10/01/19 through 10/31/19. Dkt. No. 92 - February 3, 2020; Report for: 12/01/2019 through 12/31/2019. Dkt. No. 94 - |February 25, 2020; Report for: 01/01/2020 through 01/31/2020.Dkt. No. 97 – April 23, 2020; Report for: 03/01/2020 through 03/31/2020. Dkt. No. 105 – July 8, 2020; Report for: 04/01/2020 through 04/30/2020. Dkt. No. 106 – July 8, 2020; Report for: 05/01/2020 through 05/31/2020. Dkt. No. 108 – September 3, 2020; Report for: 06/01/2020 through

Conclusion

It is axiomatic that a debtor in possession is a fiduciary. As a fiduciary, the debtor in possession does not act in its own interest but, like a trustee, must act in the best interest of the creditors of the estate. *Commodity Futures Trading Comm. v. Weintraub*, 47 U.S. 343, 354-55 (1985). "[S]ection 1104 represents a protection that the court should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession." *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989). Although courts apply a presumption that a debtor should remain in possession, they do so "based on the notion that the debtor is generally best equipped to oversee the company's reorganization." *Tradex Corp. v. Morse*, 339 B.R. 823, 830 (D. Mass. 2006). Berber's failure to timely provide clear and reliable financial information warrants appointment of a trustee or examiner. *In re Royal Alice Properties, LLC,* 2020 WL 5357795 (Bankr. E.D. Louisiana, September 4, 2020)

**WHEREFORE,** the United States Trustee prays for the immediate entry of an order appointing a trustee or examiner, and for such other relief as the court deems necessary and appropriate.

NANCY J. GARGULA
United States Trustee, Region 21

*/s/ Vanessa A. Leo*
Vanessa A. Leo
Georgia Bar No. 410598
United States Department of Justice
Office of the United States Trustee
362 Richard B. Russell Building
75 Ted Turner Drive, S.W.
Atlanta, Georgia  30303
(404) 331-4437
Vanessa.A.Leo@usdoj.gov

---

06/30/2020. Dkt. No. 109 – September 3, 2020; Report for: 07/01/2020 through 07/31/2020. Dkt. No. 110 – September 29, 2020; Report for: 08/01/2020 through 08/31/2020.

## CERTIFICATE OF SERVICE

This Is To Certify That I Have On This Day Electronically Filed The Foregoing *Notice Of Hearing And United States Trustee's Motion To Supplemental Motion To Appoint A Chapter 11 Trustee, Or In The Alternative, An Examiner* Using The Bankruptcy Court's Electronic Case Filing Program, Which Sends A Notice Of This Document And An Accompanying Link To This Document To The Following Party Who Has Appeared In This Case Under The Bankruptcy Court's Electronic Case Filing Program:

Matthew R. Brooks    matthew.brooks@troutmansanders.com
Timothy M. Gibbons    tgibbons@chamblisslaw.com, jgranillo@chamblisslaw.com
Michael D. Hurtt    hurttnotices@windstream.net; hurttecfnotices@gmail.com; G17451@notify.cincompass.com
David W. Johnson    david@hurttlaw.com, david.johnson8@gmail.com; G17451@notify.cincompass.com
Leon S. Jones    ljones@joneswalden.com, jwdistribution@joneswalden.com; cparker@joneswalden.com; cmccord@joneswalden.com; lpineyro@joneswalden.com; arich@joneswalden.com; ewooden@joneswalden.com
Thomas T. McClendon    tmcclendon@joneswalden.com, jwdistribution@joneswalden.com
Cameron M. McCord    cmccord@joneswalden.com, jwdistribution@joneswalden.com; ljones@joneswalden.com; ahirsch@joneswalden.com; cparker@joneswalden.com; lbrown@joneswalden.com; lpineyro@joneswalden.com
Thomas D. Richardson    TRichardson@Brinson-Askew.com, Tdr82454@gmail.com
Matthew J. Tokajer    jwdistribution@joneswalden.com;ljones@joneswalden.com
Stuart Freeman Wilson-Patton    agbankgeorgia@ag.tn.gov, Stuart.Wilson-Patton@ag.tn.gov

I further certify that on this day, I caused a copy of this document to be served via United States First Class Mail, with adequate postage prepaid on the following parties at the address shown for each:

| | |
|---|---|
| American Berber, Inc. | American Carpet Group, Inc. |
| PO Box 430 | PO Box 430 |
| Calhoun, GA 30703 | Calhoun, GA 30703 |

Dated: November 17, 2020

        NANCY J. GARGULA
        UNITED STATES TRUSTEE
        REGION 21

By: /s/ Vanessa A. Leo
    Vanessa A. Leo
    Georgia Bar No. 410598