# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF GEORGIA
# ROME DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| **AMERICAN BERBER, INC.,** and | ) | Case No. 19-41154-bem |
| | ) | |
| **AMERICAN CARPET GROUP, INC.,** | ) | Case No. 19-41150-bem |
| | ) | |
| *Debtors*. | ) | (Substantively consolidated and |
| | ) | jointly administered under |
| | ) | Case No. 19-41154-bem |

## NOTICE OF FILING EXAMINER'S FINAL REPORT

**COMES NOW** Burr & Forman LLP, counsel to Gary M. Murphey, as the Court-appointed examiner in the above-styled cases ("Examiner"), and hereby files the attached *Examiner's Final Report*.

Respectfully submitted, this 11th day of June, 2021.

> **BURR & FORMAN LLP**
>
> /s/ Erich N. Durlacher
> Erich N. Durlacher
> Georgia Bar No. 235563
> Suite 1100, 171 Seventeenth Street, N.W.
> Atlanta, Georgia  30363
> (404) 685-4313 [telephone]
> (404) 214-7387 [facsimile]
> edurlacher@burr.com
>
> *Counsel to the Examiner*

45714798 v1

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| AMERICAN BERBER, INC., and | ) | Case No.  19-41154-bem |
| | ) | |
| AMERICAN CARPET GROUP, INC., | ) | Case No.  19-41150-bem |
| | ) | |
| *Debtors*. | ) | (Substantively consolidated and |
| | ) | jointly administered under |
| | ) | Case No. 19-41154-bem |

**EXAMINER'S FINAL REPORT**

On February 25, 2021, the United States Trustee for Region 21 appointed Gary Murphey (the "Examiner") as Chapter 11 Examiner for American Berber, Inc. ("American Berber") and American Carpet Group, Inc. ("American Carpet Group" and together with American Berber, the "Debtors") in the substantively consolidated Chapter 11 cases that are being jointly administered under Case No. 19-41154-bem (the "Cases"), pursuant to the order of the Court entered February 25, 2021 (Dkt No. 147) (the "Examiner Order").

The Examiner filed his First Interim Report on April 20, 2021 (Dkt. No. 163) (the "First Interim Report").  The Examiner filed his Second Interim Report on May 20, 2021 (Dkt. No. 168) (the "Second Interim Report" and together with the First Interim Report, the "Prior Reports").  This will be the Examiner's Final Report in the Cases.

I.      **Examiner's Duties, Responsibilities, and Powers**

The United States Trustee's Motion for Appointment of a Chapter 11 Trustee or Examiner filed November 17, 2020 (Dkt No. 119) (the "Examiner Motion") detailed specific issues for the Examiner's consideration during the course of his investigation, including

45714798 v1

without limitation, (i) irregularities regarding sales, receivables, and receipts, (ii) discrepancies regarding personnel, and (iii) omission of other material information.

The Examiner's duties, responsibilities, and powers can be summarized as follows:

a. Conduct an investigation of the Debtors as appropriate.

b. Review and comment on the Debtors' post-petition business.

c. Investigate and report on information contained in the Debtors' schedules and monthly operating reports.

d. Investigate and report on the Debtors' post-petition customer sale and collection activity.

e. Investigate and report on the Debtors' post-petition use of personnel.

f. Review the Debtors' Plan of Reorganization and evaluate feasibility.

g. Report to the United States Trustee conduct that may justify the appointment of atrustee under 11 U.S.C. § 1104.

## II. Summary of Examiner's Prior Reports

The Prior Reports highlighted the following findings based upon the Examiner's investigation of the Debtors' business activity and financial records:

a. <u>Cessation of Business Operations</u>. The Debtors' facility is dark and no production is taking place. Georgia Power disconnected the power for nonpayment.

b. <u>BCDT Account Activity</u>. The Debtors' QuickBooks accounts (the "<u>Company Books</u>") reflect the transaction activity in a certain Synovus bank account under the name "Buy Carpet Direct Today, Inc." with an account number ending in 7761 (the "<u>BCDT Account</u>"). The BCDT Account was excluded from the

Debtors' Schedule A/B: Assets – Real and Personal Property (American Berber – Dkt. No. 24; American Carpet Group – Dkt. No. 15) (the "<u>Debtors' Schedules</u>") and the Debtors' various Monthly Operating Reports (American Berber - Dkt. Nos. 37, 56, 64-65, 76-77, 88-90, 92, 94, 96-97, 105-106, 108-110, 117, 124-135, 142-144, 164-165, & 172-173; American Carpet Group – Dkt. Nos. 22, 32, 36, & 42-43) (the "<u>Debtors' MORs</u>"). The Debtors have recently included the BCDT Account in the Debtors' MORs for January – April 2021 (Dkts Nos. 164-154 & 172-173).

Substantially all the prepetition deposits in the BCDT Account were the result of work performed by, billed by, and paid to the Debtors. Likewise, substantially all the prepetition disbursements from the BCDT Account relate to the Debtors' activities (*e.g.*, transfers to the Debtors' operating account, carpet tile purchases, Mitch Smith settlement payment). The Debtors' former employees who were responsible for posting transactions in the Company Books have said they considered the BCDT Account funds to be the Debtors' funds.

Notwithstanding the foregoing, Mr. Howard "Skip" Johnson ("<u>Mr. Johnson</u>") asserted that the BCDT Account contained his personal funds and not the Debtors' funds. While Mr. Johnson's position is supported by the initial exclusion of the BCDT Account from the Debtors' Schedules and the Debtors' MORs, the Examiner notes that the BCDT Account was likewise excluded from Mr. Johnson's Schedule A/B: Real and Personal Property (Dkt. No. 25)

3

(the "Johnson Schedules") and the various Monthly Operating Reports (Dkt. Nos. 31, 40, 44, 46, 50-51, 56-57, 59, 68, 70, 78, 94, 99, 120-121, & 125) (the "Johnson MORs")[1] filed in Mr. Johnson's individual Chapter 11 case: *In re Howard E. Johnson*, Case No. 19-41149-bem, United States Bankruptcy Court for the Northern District of Georgia, Rome Division (the "Johnson Case").

Former employees who assisted in the preparation of the Debtors' and Mr. Johnson's Chapter 11 schedules and monthly reports stated they were instructed by Mr. Johnson to exclude the BCDT Account from both the Debtor's Schedules / Debtors' MORs and the Johnson Schedules / Johnson MORs.

As noted earlier, the Debtors have started to include the BCDT Account in their monthly operating reports. Viewed in the most favorable light, the prior non-disclosures were an inadvertent oversight. At worst, it was intentional. Regardless, the BCDT Account activity reveals commingling of Mr. Johnson's personal funds with the Debtors' funds that stretches back several years.

c.  Federal and State Tax Reporting of Assets. Although the Company Books and tax returns reflect approximately $2.9 million of building, machinery and equipment, the Debtors' Schedules and the Debtors' MORs do not reflect such assets. Mr. Johnson asserts that the land and building reported on the Debtors' books and tax returns belong to him personally. Mr. Johnson has been

---

[1] Mr. Johnson filed one Post-Confirmation Quarterly Operating Report for August 1, 2020 through September 30, 2020 (Dkt. No. 125).

4

        commingling his personal property with the Debtors' assets in the Debtors' financial and tax reporting.

d.    <u>Post-Petition Contract (Fieldturf)</u>.  Without court notice and approval, the Debtors entered into a post-petition contract with certain employees to perform contract manufacturing services for the Debtors' customer.  The Examiner has not determined, and the Debtors' MORs do not reflect, what amounts may be due or owing by the Debtors to these employees as a result of this contract.

e.    <u>Carpet Tile Inventory</u>.  The Examiner noted that the BCDT Account activity reflected the purchase and sale of carpet tile inventory.  Based on the Company Books, the Examiner estimated that as much as $300,000 of carpet tile inventory should be on-site.  However, no carpet tile inventory is reflected in the Debtors' Schedules and the Debtors' MORs.  Furthermore, personnel under the direct supervision of the Examiner ("<u>Examiner Personnel</u>") did not see any carpet tile inventory during a March 9th tour of the facility.

        When questioned by Examiner Personnel as to why no carpet tile inventory was observed during the facility tour, a former employee stated he was directed by Mr. Johnson to avoid taking Examiner Personnel to the facility's storage area where the carpet tile inventory was being stored.  This former employee estimated there was carpet tile on-site worth "several hundred thousand dollars" and provided pictures of the carpet tile stored at the facility as of May 14th.

        Former employees who assisted in the preparation of the Debtors' and

5

Mr. Johnson's Chapter 11 schedules and monthly reports stated that they were instructed by Mr. Johnson to exclude the carpet tile inventory from the Debtors' Schedules, the Debtors' MORs, the Johnson Schedules, and the Johnson MORs.

Mr. Johnson has previously asserted that the carpet tile inventory is not the Debtors' property.[2] But, based on the Company Books, the carpet tile inventory appears to be the Debtors' property.  Accepted at face value, Mr. Johnson's prior position merely reflects a further commingling of his personal assets with the Debtors' assets.  Mr. Johnson's Affidavit now reflects a reversal of his prior position.[3]  Once again, Mr. Johnson's treatment of the carpet tile inventory appears to fit into a pattern of commingling, non-disclosure, and concealment.

### III. Examiner's Additional Findings Since the Second Interim Report

Since the Examiner's Second Interim Report, the Examiner and Examiner Personnel have received some – but not all - of the requested additional information and documentation required by the Court's Scheduling Order entered on May 20, 2021 (Docket No. 167) (the "Scheduling Order").  Examiner Personnel have reviewed the documentation provided by the Debtors and prepared the attached **Exhibit I**, which summarizes the status of requested items in a checklist format and sets forth the Debtors' and Examiner's respective comments.[4]

As evidenced by Exhibit I, many checklist items have been noted by the Debtors as

---

[2] *See* Ex. I, No. 3, Debtor Comment.
[3] *See Affidavit of Howard Johnson* (Dkt No. 171), ¶ 15.
[4] The list of requested items was attached to the Scheduling Order as Ex. A.

"CNP" or "Can Not Provide." The Examiner notes that many of the requested items are standard business documents that would be required not only by corporate best practices, but also by the Internal Revenue Service's records retention criteria.[5]

Mr. Robert Miller, a former employee of the Debtors, informed Examiner Personnel that Mr. Johnson had instructed one of the Debtors' contract laborers to destroy and dispose of several boxes containing the Debtor's accounting records. This may account for the Debtors' inability to produce many of the requested documents.

Examiner Personnel have received and reviewed the submitted documentation, which will be addressed in following sub-sections.

### a.     BCDT Account Update

The Debtors provided the BCDT Account pre-petition bank statements, which allowed for a comparison to the Company Books in **Exhibit II** and from which the Examiner has noted the following:

> i.     The BCDT Account activity recorded in the Company Books begins in November 2017. However, the bank statements reflect a beginning

---

[5] "Purchases, sales, payroll, and other transactions you have in your business generate supporting documents. Supporting documents include sales slips, paid bills, invoices, receipts, deposit slips, and canceled checks. These documents contain information you need to record in your books. It is important to keep these documents because they support the entries in your books and on your tax return. Keep them in an orderly fashion and in a safe place." I.R.S. Pub. 583, 12 (Jan. 2021), https://www.irs.gov/pub/irs-pdf/p583.pdf. "You must keep your records as long as they may be needed for the administration of any provision of the Internal Revenue Code." I.R.S. Pub. 583 at 15. Generally, a company must keep records that support an item of income or deduction on a tax return for 7 years. Id.

        balance of $16,992.08, as of January 1, 2017.  This balance was reduced by bank charges throughout 2017 until it was reduced to $16,932.23, as of November 1, 2017 (the "Beginning Balance Funds").  After November 1, 2017, additional transaction types (*i.e.*, deposits and disbursements) began appearing in the pre-petition bank statements.  Given no activity was recorded in the Company Books and no bank statements were provided to document the source of the beginning balance, the Examiner was unable to determine if Beginning Balance Funds were the Debtors' funds.

    ii.    All but two transactions reflected on Exhibit II appeared on the provided pre-petition bank statements.  The two transactions not appearing in the Company Books, but on the bank statements, were deposits totaling $55,027.05.  Conversely, there were no transactions appearing in the bank statements that were not recorded in the Company Books.

Nothing provided in the newly produced BCDT Account pre-petition bank statements leads the Examiner to change his opinion that the BCDT Account contains the Debtors' funds.

    **b.**    **Jennifer Harris American Express Charges**

During Examiner Personnel's interview with Jennifer Harris, a former employee of the Debtors, Ms. Harris acknowledged she had utilized her personal American Express card (the "Harris Amex Card") to incur both debtor and non-debtor expenditures.  The non-debtor expenditures included, for example, improvements to Mr. Johnson's property located at 180 N. Industrial Blvd.

8

45714798 v1

Ms. Harris indicated she had submitted periodic expense reports to the Debtors that described the nature and business purpose of the expenditure along with the original receipt. The Debtors would periodically pay amounts directly to American Express for application against Ms. Harris' account. In the Scheduling Order, the Examiner requested categories of documents that would have included Ms. Harris' monthly expense reports. *See* Scheduling Order, Ex. A, Nos. 5 & 8. To date, the Debtors have not provided the monthly expense reports.

In response to the Examiner's requests, Ms. Harris provided the following documentation related to the Harris Amex Card:

- **Exhibit III** – Harris Amex Card Summary and Detailed Charge Receipts
- **Exhibit IV** – Harris Amex Card Detailed Charge Receipts Continuation
- **Exhibit V** – Harris Amex Card April 2021 Online Statement

Exhibit III includes a summary prepared by Ms. Harris listing the charges on the Harris Amex Card that were related to both debtor and non-debtor expenditures from September 2018 forward. Ms. Harris' summary indicates the nature or purpose of each charge. Behind the summary are the detailed charge receipts that Ms. Harris downloaded from the American Express web portal. Exhibit IV is a continuation of these detailed charge receipts.[6]

These charge receipts do not contain the level of detail (*e.g.*, items purchased, quantities, etc.) that the monthly expense reports would likely include, but they do support the total amount expended. Based on a review of Ms. Harris' summary and the charge receipts, approximately 19% of the total Harris Amex Card charges ($4,223 of $22,301) were for the

---

[6] The receipts were split into two exhibits due to the file size.

9

45714798 v1

180 N. Industrial Blvd. property owned by Mr. Johnson, individually. All of the Debtors' post-petition payments to American Express were disbursed from the BCDT Account. In April 2021, Mr. Johnson requested that Synovus Bank reverse the Debtors' payments on the Harris Amex Card for the past twelve months. Exhibit III, Page 5 details these reversals and charges to the Harris Amex Card. Exhibit V is a copy of the Harris Amex Card April 2021 Online Statement that documents these reversals and charges to the account. As noted previously, all these payments were disbursed from the BCDT Account. Based on the April 2021 BCDT Account statement provided by Debtors, these payment reversals were credited to the BCDT Account.

**IV.    Documents Supporting Purchase and Sale of 102 Mauldin Road**

In the latest documents, the Debtors produced documents related to the initial purchase and subsequent sale of the real estate located at 102 Mauldin Road, Calhoun, Georgia (the "Mauldin Road Property") (*See* **Exhibit VI & VII**).

The purchase documents reflect Mr. Johnson, individually, purchased the Mauldin Road Property in August 3, 2017 for $112,000. (*See* Exhibit VI). However, the Company Books reflect that on November 9, 2017, the Debtors transferred $200,000 from its Wells Fargo operating account to Investors Title Insurance Co. for which the Debtors' recorded the transaction as a "Building" and referenced the recording information for Mr. Johnson's vesting deed (*see* Exhibit VI):

| Date | Num | Adj | Name | Memo | Clr | Split | Debit | Credit |
|---|---|---|---|---|---|---|---|---|
| | | | | **AMERICAN BERBER** | | | | |
| | | | | **Transactions by Account** | | | | |
| | | | | As of December 31, 2017 | | | | |
| 11/08/2017 | BS12-31-73 | | AMERICAN BERBER | | | 100 · GEORGIA BANK & TRUST | | 499,894.82 |
| 11/09/2017 | BS12-31-74 | | INVESTORS TITLE INSURANCE CO | DEED BOOK 2086 PG 201 LAND LOT 192 GORDON CO. MAULDING ST/41 HWY | | 180 · BUILDING | | 200,000.00 |
| 11/22/2017 | WIRE | | AMERICAN BERBER | Deposit - WIRE | | 100 · GEORGIA BANK & TRUST | | 499,739.65 |
| | | | | | | | 0.00 | 1,199,634.47 |
| | | | | | | | 0.00 | 1,199,634.47 |

(9:18 AM, 06/10/21, Accrual Basis)

The Debtors' former employees have informed Examiner Personnel that this "Building" was the purchase of the Mauldin Road Property. These transactions fall into the general pattern of Mr. Johnson's commingling of assets and using the Debtors' assets for his personal benefit.

Exhibit VII contains a portion of the sale documents reflecting Mr. Johnson, individually, sold the Mauldin Road Property in September 13, 2018 for $400,000. These documents indicate that Mr. Johnson, not the Debtors, was the seller. Shortly thereafter, three separate $100,000 deposits were made into the Debtors' Georgia Bank & Trust operating account. The Examiner was not provided sufficient documentation to determine the purpose of these transactions. But, on their face, these transactions are yet another example of Mr. Johnson's commingling of assets.

V. **Conclusion**

The Debtors have ceased regular business operations. Its main facility sits idle. Georgia Power disconnected the power for nonpayment. The Debtors have terminated their full-time employees. Examiner Personnel have spoken with the Debtors' former customers, who no longer wish to do business with the Debtors due to product quality issues. The

45714798 v1

Debtors' business operations no longer appear viable.  The Debtors' prospects for a successful reorganization appear challenged absent a substantial equity infusion or other liquidity event.

The Examiner has identified several instances of commingling of assets by the Debtors and Mr. Johnson that stretch back several years and continued during the Cases.  Mr. Johnson has repeatedly used the Debtors' funds for personal acquisitions and expenditures.  The Debtors' bank accounts have been treated like Mr. Johnson's personal bank account.  The Debtors have failed to schedule and disclose bank accounts and carpet tile inventory during the course of the Cases.  This course and pattern of conduct discloses a persistent blurring of the lines between Mr. Johnson's and the Debtors' assets and financial affairs.

The Examiner does not anticipate receiving any further documents or financial information from the Debtors.  Consequently, unless the Court has additional requests, the Examiner intends this to be his final report in the Cases.  Creditors and other parties-in-interest should have sufficient information to determine the appropriate next steps to take in the Cases.

Respectfully submitted, this 11th day of June, 2021.

/s/ Gary M. Murphey
Gary M. Murphey
3330 Cumberland Boulevard
Suite 500
Atlanta GA 30339
(770) 933-6855 [dial]
(404) 252-1839 [fax]
murphey@rfslimited.com

*Chapter 11 Examiner for the Debtors*

# **EXHIBIT LIST**

| | |
|---|---|
| I | Scheduling Order Checklist |
| II | BCDT Account Pre-Petition Activity in Company Books |
| III | Harris Amex Card Summary and Detailed Charge Receipts |
| IV | Harris Amex Card Detailed Charge Receipts Continuation |
| V | Harris Amex Card April 2021 Online Statement |
| VI | Mauldin Road Property Purchase Documents |
| VII | Mauldin Road Property Sale Documents |

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2021, a copy of the foregoing *Notice of Filing Examiner's Final Report* was electronically filed and served via the Court's CM/ECF system upon all parties registered to receive notice.

/s/ Erich N. Durlacher
Erich N. Durlacher
Georgia Bar No. 235563
Burr & Forman LLP
Suite 1100, 171 Seventeenth Street, N.W.
Atlanta, Georgia  30363
(404) 685-4313 [telephone]
(404) 214-7387 [facsimile]
edurlacher@burr.com

45714798 v1